## In re WISTON XXIV, LIMITED PARTNERSHIP, Debtor.

### Bankruptcy No. 91–40410–11.

United States Bankruptcy Court, D. Kansas.

April 2, 1993.

Joel Pelofsky, Kansas City, MO, William H. Zimmerman, Wichita, KS, for debtor.

Jonathan A. Margolies, Kansas City, MO, Michael Molinaro, Chicago, IL, Mark Thomas, for Balcor Pension Investors V.

Andrew F. Sears, Prairie Village, KS, for J.C. Nichols Co.

Harry Dixon, Omaha, NE, Clifton Jessup, Dallas, TX, for Robert Thompson and Wiston Management Co.

Douglas Peterson and John DeCoursey, Topeka, KS, for Western Resources, Inc.

Jeffrey Rockett, Asst. U.S. Trustee, Wichita, KS.

### MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

This case is before the Court to determine whether the debtor's plan of reorganization should be confirmed.

### INTRODUCTION

This is a single-asset case in which numerous issues have been litigated between

the debtor and its mortgagee, Balcor Pension Investors V (Balcor), while the case has been pending before this Court. The debtor's asset is an apartment complex in Johnson County, Kansas. After approval of the debtor's sixth amended disclosure statement, the case came before the Court on March 2, 1993, for consideration of the confirmation of the debtor's fourth amended plan of reorganization.

A threshold problem immediately arose at that hearing. Balcor had filed an objection to confirmation of the debtor's plan and, among other things, objected to the classification of Merchants Bank, a creditor secured by a second mortgage on the apartment complex, in a class by itself. This class was the only impaired class which had accepted the debtor's plan, and so confirmation might have been impossible if the Court sustained Balcor's objection. *See 11 U.S.C.A. § 1129(a)(8) and (b)(1).* The Court in fact did sustain Balcor's objection to Merchants' classification, holding that the bank was a wholly unsecured creditor because Balcor's first mortgage was undersecured, and that the debtor had shown no valid basis for separating Merchants from the other unsecured creditors. This eliminated the only impaired class which had voted favorably for the debtor's plan. Merchants's claim was moved into the class of unsecured creditors, previously consisting of only two voting claim holders, one of whom was Kansas Power & Light, recently renamed "Western Resources" (KPL). KPL had voted to reject the plan. The addition of Merchants to this class meant two of the voting creditors in the class had accepted the plan, so the one-half in number portion of § 1126(c) was satisfied for the class, but KPL's claim constituted 38% of the amount of the voting creditors' claims, so the two-thirds in amount portion of the statute was not satisfied.

However, reacting to perceived improprieties in Balcor's pre-voting activities, the debtor moved to "designate" KPL under § 1126(e) as an entity whose rejection of the plan had been solicited or procured in bad faith. If the Court designates KPL, its vote will not count for purposes of determining under § 1126(c) whether the class has accepted the plan, and the class would accept the plan. If not, there would still be no impaired class that has accepted the debtor's plan.

The Court heard evidence on all the confirmation requirements of § 1129(a) and (b), but adjourned the hearing until March 24, 1993, to provide an opportunity for discovery and the presentation of evidence on the debtor's motion to designate KPL. The hearing reconvened and was concluded on March 24, 1993. The Court is now ready to make its rulings.

### FACTS AND CONCLUSIONS ON DESIGNATION

During this chapter 11 proceeding, the debtor made post-petition payments to two creditors, Merchants Bank and KPL. As indicated previously, Merchants held a second mortgage on the debtor's apartment complex. Apparently intending to provide adequate protection, the debtor made payments to Merchants for a period of about 18 months and then stopped. KPL had an agreement with the debtor which purports to be a lease of a 500–ton Hitachi chiller/heater and related equipment. The debtor made payments for a period of 18 months as though the agreement were a true lease and then stopped.

Initially, the debtor treated Merchants' claim as being fully secured by the second mortgage on the debtor's real property. Subsequently, the debtor awakened to the fact that Merchants was instead wholly unsecured because the value of the property was less than the amount of Balcor's first mortgage. The debtor may have been motivated to pay Merchants because its general partner guaranteed the debt to the bank. The debtor initially intended to pay KPL as a lessor. It apparently later determined that the lease was a disguised secured transaction and began treating the claim as secured. Finally, it discovered that KPL had not filed a financing statement, and so began treating the claim as unsecured. In any event, about 18 months into the case, the debtor ceased making

postpetition payments to the two creditors and began treating them as unsecured creditors in subsequent amendments to its plan. Before the vote on the debtor's fourth amended plan, KPL had either failed to vote or voted to accept the plan. Those plans had provided full payment to KPL over a period of five years after confirmation. The fourth amended plan also provides for full payment to KPL, but it proposes making no payments to KPL for the first 18 months, paying interest only for the next 18 months, and then amortizes KPL's principal and interest over the next seven years. KPL rejected this plan.

Balcor has objected to each of the debtor's six disclosure statements and four plans on a number of grounds. It complained about treating Merchants' and KPL's claims as secured, asserting that they were unsecured. It further objected to the debtor's failure to try to recover the postpetition payments made to these creditors because it claims the money used to pay them was its cash collateral, arising from the apartment rental payments which comprise essentially all of the debtor's gross revenues. Because the Court indicated in an order signed September 15, 1992, that it agreed with Balcor's objection that the postpetition payments to these creditors, now thought to be unsecured, were unauthorized and thus possibly violated 11 U.S.C.A. § 549, the debtor changed its treatment of KPL and Merchants under the plan and proposed to allow them to retain the payments made postpetition as advance principal payments on their unsecured claims. In addition, at least with respect to KPL, although the debtor's fourth plan did not completely rule out a § 549 action against KPL, it indicated that the debtor intended to recover the improper payments through recoupment rather than litigation because, since the claim was to be paid in full under the plan, costly litigation, even if successful, would merely temporarily recover money that would then be repaid to KPL. It appears that the debtor believed the 18 months without payments followed by 18 more months where only interest was paid would make KPL's treatment equal to the treatment of the other unsecured creditors who are to be paid over time under the plan.

After the debtor mailed its fourth plan to creditors for voting, Balcor contacted KPL and began negotiations which ultimately resulted in an agreement between the two creditors. As written, the agreement states that if Balcor obtains title to the apartment complex or if a sale of the complex occurs through Balcor's pending foreclosure action, KPL would give Balcor all of its rights in the 500–ton chiller/heater unit at the complex in exchange for $105,000 and Balcor's promise not to seek recovery of the debtor's improper postpetition payments to KPL, about $80,000, and to return such payments if someone else (a bankruptcy trustee, for example) recovered them for Balcor. Although this provision is not stated in the contract, Balcor conditioned its acceptance of the agreement on KPL voting to reject the debtor's plan. Counsel for KPL expressed concern that the written agreement and the condition precedent set by Balcor might cause a designation of its vote but was assured by Balcor's counsel that everything would be all right. KPL had not determined how it was going to vote until after Balcor offered this agreement. Balcor held the contract without signing it until it was assured by KPL that it had in fact voted against the debtor's plan.

At the time the agreement was made, Balcor was unaware of the actual value of the equipment, had seen the "lease" agreement between the debtor and KPL, knew that it had a perfected security interest which covered the equipment if KPL's agreement with the debtor was not a true lease, was aware that KPL had not objected to its treatment under the debtor's plan as an unsecured creditor, and was aware KPL had not claimed to have a security agreement or a filed financing statement covering the equipment. It should have been aware, then, that its perfected security interest in the equipment would have priority over KPL's interest if the "lease" was actually intended as security. *See K.S.A. 84–9–102(2); K.S.A. 1992 Supp. 84–9–301(1)(a).* While KPL's agreement with

the debtor is called a "lease" and reserves title in KPL throughout the term of the agreement, a number of things about the "lease" indicate it was actually a disguised secured transaction. *See K.S.A. 1992 Supp. 84–1–201a(37) (defining "security interest" and indicating "lease" may create security interest rather than constitute true lease); see also K.S.A. 1992 Supp. 84–1–201(37) (new definition of "security interest" with more extensive rules about when a lease is intended as security).* For example, the agreement indicates that KPL bought the equipment for the debtor at the cost of $265,720.74, including applicable sales taxes, and that the debtor's "lease" payments were calculated by amortizing that principal amount plus interest at one percent over a certain bank's prime rate (adjustable annually) over the seven-year term of the "lease." The debtor could buy the equipment at any time for the principal balance then remaining due under that amortization schedule plus any accrued interest, or at the end of the lease term for one dollar. The evidence showed the useful life of this equipment is twenty-three years, its current estimated value is in excess of $100,000, and it has been well-maintained.

Balcor argues that it made the agreement with KPL for purely economic reasons, not to buy KPL's vote in hopes of defeating a reorganization plan Balcor opposed. Purportedly Balcor was worried about having a dispute with KPL over the ownership of the Hitachi unit in the event Balcor obtained possession of the complex. Obviously, the unit was needed to supply the heating and air conditioning needs of the apartment complex. Thus, according to Balcor, it decided to enter into the agreement with KPL to resolve this potential dispute without litigation and assure Balcor would become the owner of the Hitachi unit. Although Balcor concedes it did require KPL to vote against the debtor's plan to validate the agreement, Balcor contends it did so only to ensure that its negotiators would not look foolish; the foolish appearance would allegedly result from making an agreement ensuring ownership of the Hitachi unit if the debtor failed to gain

approval of its plan with an entity which then voted to accept the debtor's plan that provided for full payment to all creditors and which Balcor opposed. Balcor's counsel assured the Court that this is sound corporate logic, but the Court does not understand the reasoning. If the agreement was a purely economic decision, then its timing is suspect and the condition precedent was unnecessary. If it was a purely economic decision, then Balcor should not have been concerned about KPL's exercise of its own economic judgment. Balcor's written words say, "Let us come to an agreement so that if I come into possession there will be peace between us," but its actual posture when the unwritten condition precedent is added says, "Help me get into possession and I'll make peace with you." Even KPL's counsel, a self-professed bankruptcy novice, questioned the propriety of Balcor's action.

In sum, the dispute started with the debtor making postpetition transfers to Merchants and KPL which it probably thought were appropriate when it made them, but which were not authorized by the Court and were probably not in the ordinary course of the debtor's business. The funds which the debtor used to make the payments were not at the time considered to be Balcor's cash collateral, but now are, following a decision on appeal. Balcor objected to the transfers the debtor made and insisted that the debtor correct the problem of the unauthorized postpetition use of its cash collateral. Before Balcor made this objection, the debtor had reached an agreement with KPL concerning its treatment under the plan, but as a result of Balcor's objection and the Court's comment thereon in its September 1992 order, the debtor changed its plan to treat the postpetition transfers as prepayments of principal, and to extend the length of KPL's payout from five to ten years. Balcor then approached KPL and promised that if KPL would vote against the debtor's plan and Balcor thereafter came into possession of the apartment complex, Balcor would not attempt to recover from KPL the $80,000 or so if improperly transferred cash collateral and

would also pay KPL an additional $105,000 in return for KPL's release of any claim it might have to the Hitachi equipment. Based on these facts, the debtor contends Balcor solicited or procured KPL's plan rejection in bad faith.

The Court concludes that the KPL should be designated as an entity whose rejection of the plan was solicited or procured in bad faith in violation of § 1126(e), and so its vote should not be counted under § 1126(c) in determining whether the class of claims which includes KPL's claim accepted the debtor's plan. Unquestionably, KPL acted in its own interest in accepting the deal with Balcor. If the debtor's plan is defeated, KPL will receive $105,000 in cash and forgiveness of probably improper postpetition transfers of $80,000 to $85,000 of what is currently considered Balcor's cash collateral. However, had Balcor not insisted on a negative vote, it is conceivable that KPL might have voted in favor of the plan, which would pay its total claim over time, and still made the agreement with Balcor in case the plan was not confirmed. Either way, KPL would avoid § 549 litigation and be paid a large portion of its claim, despite the improper payments and the questionable status of its "lease."

Instead, by agreeing to reject the plan, KPL gave up only the chance that its accepting vote would have allowed it to be paid somewhat more money by the debtor over a number of years and its claim to ownership of the Hitachi equipment under its lease with the debtor—a claim it had already waived for purposes of the debtor's plan, presumably because the "lease," though not yet declared a disguised secured transaction, has many of the earmarks that this and other courts have relied on to find a lease to be intended as security rather than a true lease. *See, e.g., Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 217–21, 531 P.2d 41 (1975); *see also B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code,* ¶¶ 1.05[3] and [4] (2d ed. 1988) (extensive analysis of case law). Balcor obtained a blocking vote for the unsecured class, by objecting successfully to Merchants' separate classification

and obtaining KPL's vote, though Balcor claims it was not aware that it was a blocking vote. In fact, under the circumstances the Court finds it hard to believe Balcor made the agreement to pay $^{19}\!/\!_{24}$ths of KPL's claim solely to resolve a purportedly disputed issue—whether KPL's agreement was a true lease or disguised secured transaction—which KPL had already conceded for purposes of the debtor's plan by failing to object to its classification under the plan as an unsecured creditor. It seems much more likely Balcor had a dual purpose, part of which was to purchase KPL's vote without advancing money to buy its claim. In essence, through its objections to the debtor's dealings with KPL, Balcor forced the debtor to propose a method of recovering the postpetition payments it had made to KPL, and then Balcor promised to forgive the inappropriate transfers and pay KPL an additional $105,000 Balcor would almost certainly not have to pay in exchange for a vote against the debtor's plan. Balcor's actions constitute bad faith solicitation or procurement of KPL's vote.

## FACTS AND CONCLUSIONS ON FEASIBILITY

■ In addition to the objections discussed above, Balcor also objected to the debtor's plan because it is not feasible, does not meet the best interest of creditors test, was not proposed in good faith, and does not pay Balcor the present value of its claim. More specifically, Balcor complains (1) the plan simply delays the debtor's loss of the property in hopes the value of the apartment complex will increase enough to pay all the claims while a management company controlled by the debtor's general partner receives a fee of five percent of the gross proceeds from the complex; (2) Balcor is the only entity at risk, since the equity holders have invested little or no capital in the debtor and will not invest much under the plan; (3) Balcor is not receiving as much as it would get if the debtor were liquidated; (4) the interest rate offered is below the market rate; and (5)

the complex generates insufficient cash flow to fund the debtor's plan, as shown by the pre- and postpetition operating deficits. Given various amendments to the plan that the debtor has proposed during the hearings on confirmation, Balcor also contends the debtor has unfairly made its plan a moving target. Finally, Balcor has asked for further stay relief to proceed to judgment and sale in a foreclosure action that the Court previously gave it partial stay relief to pursue after the debtor failed to obtain confirmation of an earlier plan.

The debtor's current plan proposes to pay Balcor as a creditor secured by real property and cash collateral valued at $11.6 million. The debtor wants to amortize $10.6 million over thirty years at 8.5% interest, with a balloon payment coming due after ten years for the full balance then owed. The real property has a value of $10.3 million. The remainder of Balcor's security is the cash collateral represented by the accrued net rents. Some of that cash collateral, however, was paid to KPL and Merchants, as mentioned previously, and thus exists only as a § 549 claim against those creditors; the remainder has been deposited in the debtor's bank accounts. The debtor's plan says the debtor will pay $1,000,000 of this money to Balcor at confirmation and use the remainder in its cash flow.

During the debtor's March 2, 1993, presentation, the debtor offered to turn over to Balcor at confirmation an additional $138,000 of the cash collateral in order to assure Balcor that its cash collateral would not be used to pay other creditors during the first year of the plan. The debtor also disclosed that under an agreement with new prospective limited partners, it had just received $300,000 which was being held in escrow until the escrow agent was notified the debtor's plan had been confirmed and several other rather minor conditions were met. This disclosure necessitated a further hearing the following day so the debtor could prove the money was in the escrow account and the terms of its release; Balcor objected to such a presentation, but the Court allowed it. During these hearings, the debtor referred to "the

remaining cash collateral," apparently meaning the amounts that might be recovered from KPL and Merchants under § 549, not actual cash. At the hearing on March 24, during closing argument by the parties, the Court asked how Balcor was to be protected with respect to the missing cash collateral, the so-called "remainder" of its security. The debtor's counsel replied that, though he did not have present authority from his client, he would propose that the amount of the missing cash collateral would be fully paid to Balcor from the escrowed money. In addition, counsel volunteered that the management company controlled by the debtor's general partner would forego receipt of its five percent commission until Balcor was paid each month and that certain insurance proceeds might exceed the cost of roof repairs, making the excess available for other purposes.

The Court notes that none of these last-minute proposals are included in the debtor's disclosure statement or plan. The disclosure statement declares on page 19 that the entire amount of the insurance recovery must be used to make the roof repairs in order to maintain the value of the property. In addition, the debtor's plan also calls for the debtor's general partner to contribute $100,000 during the first two years of the plan. The general partner testified that he does not currently have $100,000 in cash to contribute, and did not indicate how he would get the money. Thus, there is no guarantee that the money will be forthcoming, especially if the management company he controls would for any reason have to forego its five percent commission in order to assure payment to Balcor.

As filed, the debtor's plan does not demonstrate that its income will be sufficient to pay its expenses plus the payments due under the plan. The general partner's promise to pay $100,000 cash to the debtor in the next two years is not supported by proof he has any tangible means of satisfying that promise. Without his contribution, the plan shows a negative cash flow, even assuming everything else goes as the debtor has projected and the Court rules in the

debtor's favor on all pending disputes. On average, over the months from September 1992 through February 1993, the occupancy level of the apartment complex has not met the debtor's projections, causing a decrease in gross income and a further increase in the expected negative cash flow. If the new $300,000 is diluted by paying a substantial portion of it for cash collateral reimbursement, its remaining addition to the debtor's cash flow may still be insufficient. If it is not used to replenish Balcor's cash collateral, then Balcor's secured claim would be jeopardized. In fact, since the Court had required the debtor to segregate the rents and obtain permission before using them to pay any nonordinary expenses even before it was ruled the rents were Balcor's cash collateral, the amount of the missing cash collateral might constitute an administrative expense, pursuant to §§ 507(b), 361, and 363, which would have to be paid in full on the effective date of the plan, as required by § 1129(a)(9). Thus, as written, the debtor's plan is not feasible.

The quick fixes suggested by counsel—the subordination of the management fees to at least the payments to be made to Balcor, the use of some of the insurance money for operations rather than for repairs, the use of the new investors' money for repayment of a cash collateral shortfall—either do not comply with the plan, do not comply with the escrow agreement, or reduce the general partner's ability to raise the funds he promises to invest in the reorganized debtor. The proposed changes in the plan and in the use of the escrowed money would require notice to the affected parties before they could be implemented. Having determined that the plan as filed is not feasible and so not confirmable and that all or a good part of the suggested modifications cannot be made without notice to the affected parties, the Court declines to address any remaining issues.

 The debtor's plan is not confirmable. The case has been on file for two years, during which time the debtor has filed four plans and six disclosure statements, without obtaining confirmation.

The time has come to give Balcor complete stay relief to proceed with its foreclosure action. Separate judgments will be entered to make final the decisions rendered herein on designation, confirmation, and stay relief.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.