**In re James E. HOCKENBERRY, Jr., Debtor.**

**No. 09–59064.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division, at Columbus.

Sept. 16, 2011.

---

James E. Nobile, Nobile & Thompson Co., L.P.A., Hilliard, OH, for Debtor.

*MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

James E. Hockenberry, Jr. ("Hockenberry" or "Debtor") has proposed a Chapter 11 plan under which the only general unsecured creditor in his case—a creditor holding a claim of nearly one million dollars—would receive a mere $10,000 over eight years. The creditor, Cadles of Grassy Meadows II, LLC ("Cadles"), would like to receive more and, not surprisingly, has rejected the plan and objected to con-

firmation. Paying a creditor cents on the dollar over time rather than immediately on the effective date of the plan is commonplace and, in and of itself, would not lead to a denial of confirmation. But here the delay in payment causes the plan to violate 11 U.S.C. § 1129(a)(7) because the proposed payments have a present value that is less than the amount Cadles would receive in a Chapter 7 liquidation. And the Debtor has not established the feasibility of his paying the amount he proposes—let alone the higher amount he would need to pay in order to satisfy § 1129(a)(7). For those reasons, the Court must deny confirmation of the Debtor's plan.

### II. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

### III. Background

#### A. Factual Background

The facts set forth below are not in dispute.[1] Sometime in the 1980s, Hockenberry became a limited partner in a window company, Thermal Guard, Inc., an Ohio corporation ("Thermal Guard"). The company's limited partners, including Hockenberry, personally guaranteed a $250,000 business loan that Thermal Guard obtained from TransOhio Savings Bank ("TransOhio"). Thermal Guard defaulted on its payments under the loan and, on October 13, 1989, TransOhio obtained a joint and several judgment against the company and its partners from the Summit County, Ohio Court of Common Pleas ("State Court") in the amount of $289,000 plus accrued interest of $24,356.97 through August 29, 1989 and post-judgment inter-

---

1. The factual background is drawn from the documents on file in this case and the testimony of witnesses presented at the hearing on confirmation of the amended plan ("Hearing").

est at the rate of 12% per annum. The judgment eventually became dormant. After acquiring the judgment in 2006, Cadles obtained an order from the State Court reviving it and then garnished Hockenberry's wages and certain bank accounts he owned jointly with his wife, Elsie Hockenberry ("Mrs. Hockenberry"), collecting between $5,000 and $6,000 through those efforts. In 2008, Hockenberry moved the State Court to vacate the revived judgment, but his motion was denied.

After a failed attempt to restructure the debt owed to Cadles in a Chapter 13 case,[2] Hockenberry filed a petition under Chapter 11 on August 7, 2009 ("Petition Date"). On Schedule F, he listed Cadles as holding a disputed general unsecured claim in the amount of $970,019.72. *See* Doc. 1. Cadles timely filed a proof of claim asserting a general unsecured claim in the amount of $989,121.51. The Debtor has not filed an objection to the proof of claim. Cadles is the only creditor in the Debtor's bankruptcy case with a scheduled or filed general unsecured claim.

## B. The Amended Plan

After filing an original plan and disclosure statement, Hockenberry—in order to address concerns raised by the Court—filed an amended plan ("Am. Plan") (Doc. 72) and an amended disclosure statement ("Am. Disclosure Statement") (Doc. 73). No party objected to the Amended Disclosure Statement, which the Court approved as containing adequate information to soli-

cit votes on the Amended Plan, but Cadles voted to reject, and filed an objection to confirmation of, the Amended Plan ("Objection") (Doc. 83).

The Amended Plan is straightforward. Hockenberry proposes to continue paying his first and second mortgages monthly as required by the underlying mortgage documents.[3] The claims of both mortgagees are unimpaired and the mortgages were current as of the Petition Date. Hockenberry proposes to pay the impaired claims secured by his automobiles in full at 5% interest. The claim of Ford Motor Credit secured by the Debtor's 2003 Ford Expedition will be paid $180.97 per month for 24 months; the claim of Ohio Central Savings Bank secured by the Debtor's 2003 Chevrolet Silverado will be satisfied by payments of $218.21 per month for 12 months. Am. Disclosure Statement at 20, 24–25. Hockenberry's only priority unsecured claims are attorney fees in the estimated total amount of $6,000 and United States Trustee fees.

The claim held by Cadles is the only claim in Class F and would receive the following treatment under the Amended Plan:

*CLASS F—ALLOWED CLAIMS OF NONPRIORITY UNSECURED CLAIMS*

The Debtor owes one (1) claim that will be allowed and paid as a NONPRIORITY UNSECURED CLAIM.

That claimant is Cadles of Grassy Meadows II, LLC ("Cadles"). Cadles

---

2. Hockenberry's prior case was dismissed on the ground that he was ineligible for Chapter 13 relief. Under § 109(e) of the Bankruptcy Code, in order to be eligible for Chapter 13 relief, an individual's noncontingent, liquidated, unsecured debts must aggregate less than $360,475 at the date of the filing. *See* 11 U.S.C. § 109(e). Hockenberry's debt to Cadles caused him to exceed this monetary threshold (which, at the time he filed his prior Chapter 13 case, was $336,900).

3. The amounts of the monthly mortgage payments are not set forth in the Amended Plan or the Amended Disclosure Statement. During the Hearing, the Debtor testified that his mortgage payments are approximately $1,300 per month on the first mortgage and approximately $440 per month on the second. *See* Hr'g Tr. (Doc. 94) at 41.

filed a timely proof of claim on September 2, 2009 in the amount of $989,121.51. The Debtor disputes this debt, as set forth in his Bankruptcy Schedules. However, in lieu of formally challenging the debt, the Debtor is offering to pay Cadles more than it would receive if the Debtor liquidated his assets in Chapter 7.

Based upon the Debtor's liquidation analysis of his non-exempt equity in his real and personal property, there appears to be net-value available to pay all priority and nonpriority unsecured creditors in the approximate amount of $15,519.00. After payment of administrative priority unsecured claims expected to be allowed in this Case, and currently estimated at $6,000.00, there will be $9,519.00 in net-value to pay the claim in CLASS F. However, to encourage CLASS F to accept the Plan, the Debtor will pay the Allowed Claim in CLASS F $10,000.00. The claim in CLASS F will be paid zero (0%) interest, and will be paid over eight (8) years.

The Debtor shall make payments in *annual disbursements* estimated at $1,250.00. The annual payment cycle will begin with the year following the year of confirmation of the Plan. Each payment will be disbursed on or before April 15th of each year.

Am. Plan at 8–9. The Amended Disclosure Statement reflects that the Debtor will set aside $104.16 per month to service the claim of Cadles. *See* Am. Disclosure Statement at 20. The Debtor's liquidation analysis estimates that Cadles would receive $9,519 in a Chapter 7 liquidation.

Hockenberry's ability to make payments to creditors under the Amended Plan will depend on his future earnings as a mortgage broker (paid on a commission basis) and his wife's income as a school teacher. According to the Amended Plan and the Amended Disclosure Statement, Hockenberry's net monthly average income since the Petition Date is $3,275,[4] and he estimates his average monthly household expenses, including mortgage payments, utilities, food, medical expenses, transportation and the like are $2,700 per month.[5] Am. Plan at 11–12; Am. Disclosure Statement at 20.

4. By the Court's calculations, based upon the monthly operating reports on file to date (the last of which was filed for the period ending July 31, 2011), Hockenberry's net monthly income averages $3,005.30. There is, however, one monthly operating report missing—the report for the period ending March 31, 2011. The difference between the Debtor's income per the Amended Disclosure Statement and his income as reflected in the monthly operating reports is $269.70.

5. On the Petition Date, Hockenberry filed schedules of assets and liabilities, along with an Official Form B22 ("Form B22"). Hockenberry has also filed monthly operating reports, although not on a timely basis. The various filings create a confusing picture of Hockenberry's true financial condition. Schedule I—Current Income of Individual Debtor(s) reflects that his gross income is $2,919.50 per month; after deducting for payroll taxes, his net monthly take-home pay is $2,368.88. According to Schedule I, Mrs. Hockenberry, a teacher at Worthington Christian School, is paid $2,350 per month. After deductions for payroll taxes, insurance and her pension contribution, her take-home pay, according to Schedule I, is $1,665.65 per month. The Hockenberrys' Schedule I combined gross monthly income is $5,269.50; their net monthly income is $4,029.53. Schedule J reflects average monthly expenses of $3,529.53, leaving $500 per month to be devoted to payments under the Amended Plan. Hockenberry's Form B22 reflects that he has gross average monthly wages and commissions of $6,609.51, with the notation that the amount of income listed on his Schedule I "is reflective of average income over past 2 years[.]" Mrs. Hockenberry's gross average monthly income is listed as $2,279.92. Per the Form B22, their total gross current monthly income at the time of filing was $8,889.43. The Form B22 does not provide net monthly income figures, nor does

## C. The Hearing/Post–Hearing Briefing

During the Hearing, Hockenberry and John Benetis, team leader and account officer with Cadles, testified. Hockenberry filed a post-hearing brief in support of confirmation (Doc. 96), Cadles filed a brief in response (Doc. 99) and Hockenberry filed a reply brief (Doc. 102).

## D. Mrs. Hockenberry's Income and Expenses

Mrs. Hockenberry earns between $2,279.72 (Form B22) and $2,350 (Schedule I) per month. Schedule I and the Amended Plan, *see* Am. Plan at 12, both report that Mrs. Hockenberry's take-home pay is $1,665 per month. Schedule J lists "Spousal Expenses/Marital Adjustment" of $600 per month. The Debtor testified that these "spousal expenses" include gasoline for Mrs. Hockenberry's car, her contribution toward insurance (presumably property and automobile insurance, given that she has a health insurance payroll deduction listed on Schedule I), life insurance premiums, food and household maintenance. Hr'g Tr. at 36. He further testified that he "tr[ies] to pay the major expenses, the mortgage, the utilities, cable, things of that nature. She handles the food and things of that nature. When my income is not sufficient, she assists me in making the other bills." *Id.* at 35. He also testified that prior to the bankruptcy he and his wife had a joint bank account in which they deposited all of their money and from which they paid all of their bills, but that system ended when Cadles garnished the bank account. *Id.* According to Hockenberry, without his wife's income he would not be able to make his payments

under the terms of the Amended Plan. *Id.* at 37. At the same time, he testified that his wife is 65 years old and would like to retire. Upon doing so, she will qualify for a Social Security retirement benefit. *Id.* at 34.

Mrs. Hockenberry did not testify, nor was any stipulation presented that would verify her expenses, her willingness to contribute to Mr. Hockenberry's plan payments or her intentions regarding retirement.

## E. The Objection

Cadles contends that the Amended Plan has not been proposed in good faith and therefore violates § 1129(a)(3); does not satisfy the "best-interests-of-creditors" test of § 1129(a)(7); does not satisfy § 1129(a)(8) because each impaired class has not accepted the Amended Plan; does not meet the projected disposable income test set forth in § 1129(a)(15); violates § 1129(a)(1) and (a)(2) because it fails to satisfy the more specific provisions of the Bankruptcy Code referred to above; and unfairly discriminates against, and is not fair and equitable to, Cadles, as required by § 1129(b)(1). With respect to the fair and equitable standard, while Hockenberry argues that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") abrogated the "absolute priority rule" (which is a component of the fair and equitable standard as it relates to unsecured creditors) in its entirety in the Chapter 11 cases of individuals, Cadles contends that the rule continues to apply in individual Chapter 11 cases even after the enactment of BAPCPA.

the official form for use by individual debtors require such figures. To date, Hockenberry has filed 23 monthly operating reports. The total net income reflected by the monthly operating reports is $66,088.28, or a monthly average net income of $3,004.01. In sum,

Hockenberry's gross monthly income has been variously reported as $2,919.50, $6,609.51 and $3,004.01. No amended Schedules I or J or amended Form B22 have been filed since the Petition Date.

## IV. Legal Analysis

### A. The Court's Independent Duty and the Debtor's Burden of Proof

 The Court has an independent duty to determine compliance with the Bankruptcy Code's confirmation requirements. *See Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1299 n. 4 (11th Cir.2001) ("A court must independently satisfy itself that these criteria [of § 1129(a)] are met."); *In re New Midland Plaza Assocs.*, 247 B.R. 877, 895 (Bankr. S.D.Fla.2000) ("The Court . . . has an independent duty to determine whether a Plan complies with the best interests of creditors."); *In re Future Energy Corp.*, 83 B.R. 470, 503 (Bankr.S.D.Ohio 1988). ("The issue of compliance with § 1129(a)(11) [the "feasibility" requirement] was not raised by the objectors. Nevertheless . . . the Court has an independent duty to determine that all of § 1129(a)'s confirmation criteria have been met."). Indeed, the Court cannot confirm a Chapter 11 plan if its proponent—here, the Debtor—fails to prove by a preponderance of the evidence that the plan satisfies each of the applicable requirements. *See, e.g., Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997). And the Amended Plan fails to satisfy at least two of those requirements—the best-interests-of-creditors test of § 1129(a)(7) and the feasibility test of § 1129(a)(11). The Court will address each in turn.

### B. The Best–Interests–of–Creditors Test

Section 1129(a)(7) provides in pertinent part as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . .

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129(a)(7)(A). Commonly known as the best-interests-of-creditors test, "§ 1129(a)(7) requires that with respect to each impaired class, the class must unanimously accept the plan or each holder of a claim within the class must receive under the plan at least what such holder would receive under a Chapter 7 liquidation." *Future Energy*, 83 B.R. at 489.

Cadles—the sole member of Class F (Allowed Claims of Nonpriority Unsecured Claims), which is impaired—has not accepted (and in fact has voted to reject) the Amended Plan. Based on its review of the Debtor's liquidation analysis and the Amended Plan's treatment of the claim held by Cadles, for the reasons set forth below, the Court concludes that the stream of payments that Cadles would receive under the Amended Plan has a present value (on or about the date that would be the effective date if the Amended Plan were confirmed as of the date of this opinion),[6] that is less than the amount Cadles would

---

**6.** According to the Amended Plan, " 'Effective Date' shall mean the later of (i) the date which is eleven (11) days after Confirmation, unless an earlier date is selected by Debtor, or (ii) the date upon [sic] all conditions to the effectiveness of the Plan are satisfied or waived." Am. Plan at 3.

receive if the Debtor's assets were liquidated under Chapter 7.

◼ Under the Amended Plan, Cadles would receive $10,000 in eight annual payments of $1,250; the first payment would be made on or about April 15 of the year following the year of confirmation, and the remaining payments would be made on or about April 15 of each successive year, until the $10,000 is fully paid in year eight. In order to determine the value of those payments "as of the effective date of the [Amended Plan]," 11 U.S.C. § 1129(a)(7)(A)(ii), the Court must discount them to their net present value as of the Amended Plan's effective date. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 474 & n. 10, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) ("[T]he Bankruptcy Code includes numerous provisions that ... require a court to discoun[t] ... [a] stream of deferred payments back to the[ir] present dollar value.... *See* [*e.g.*,]11 U.S.C. § 1129(a)(7)(A)(ii)[.]" (internal quotation marks and citation omitted)); *In re Nohr*, No. 486–00495, 1988 WL 88767, at *2 (Bankr.D.S.D. Apr. 4, 1988) ("[T]he present value of the ten (10) annual payments made at the end of each period to these creditors is $43,828.67. This amount clearly is much less than what they would have received in a Chapter 7 liquidation. Thus, the debtors' Chapter 11 plan fails to comply with Section 1129(a)(7)(A)(ii)."); *In re Brusseau*, 57 B.R. 457, 461 (Bankr.D.N.D. 1985) (holding that the debtor's Chapter 11 plan failed to satisfy the best-interests-of-creditors test where the present value of

the payments to be made to unsecured creditors under the plan was less than the amount the creditors would have received in a Chapter 7 liquidation). *Cf. Hardy v. Cinco Fed. Credit Union (In re Hardy)*, 755 F.2d 75, 77 (6th Cir.1985) ("The sole issue on appeal is whether the value of property to be distributed under a Chapter 13 plan [to unsecured creditors] must be reduced to present value when applying the 'best interest of creditors test' contained in § 1325(a)(4).... The express wording of the statute and the legislative history support the bankruptcy judge's conclusion that the value of property to be distributed under a Chapter 13 plan must be reduced to present value.");[7] *Cardinal Fed. Sav. & Loan Ass'n v. Colegrove (In re Colegrove)*, 771 F.2d 119, 121 (6th Cir. 1985) ("[I]n [*Hardy*] the court affirmed the bankruptcy court's order denying confirmation of a Chapter 13 plan because of its failure to include interest on the amount due Cinco Federal Credit Union, an unsecured creditor. The court interpreted [§ 1325(a)(4)] to require interest on all deferred payments to be made under the plan. In our view, a contrary conclusion would prevent the creditor from realizing the full present value of the amount owed." (footnote omitted)).[8]

◼ "The requirement that the 'value' of the property to be distributed be determined 'as of the effective date of the plan' incorporates the principle of the time value of money." *Till*, 541 U.S. at 486–87, 124 S.Ct. 1951. There is no doubt, therefore,

---

7. Neither *Hardy* nor any other decision of the Sixth Circuit has addressed the issue of the appropriate discount rate to be used in the context of the best-interests-of-creditors test in Chapter 11 or Chapter 13.

8. Section 1325(a)(4), which is substantially similar to § 1129(a)(7)(A)(ii), provides in pertinent part as follows:
 [T]he court shall confirm a plan if—

 ....
 (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]
 11 U.S.C. § 1325(a)(4).

that a Chapter 11 plan does not satisfy the best-interests-of-creditors test if the debtor, rather than paying a creditor the amount it would receive in a Chapter 7 liquidation in full on the effective date of the plan, proposes instead to pay that same amount over time. In order to satisfy the best-interests-of-creditors test, a debtor making deferred cash payments must pay more than the liquidation amount in order to compensate creditors for the time value of money lost because of the delay in payment. Of course, where unsecured creditors would receive no distribution in a Chapter 7 liquidation, payment of their claims in any amount over time would clearly satisfy the best-interests test. *See In re Young,* 61 B.R. 150, 155 n. 4 (Bankr.S.D.Ind.1986) ("Obviously, application of a discount factor and the resulting comparison is mooted where the creditor would receive nothing given a Chapter 7 liquidation."). By contrast, if unsecured creditors would receive some distribution in a Chapter 7 liquidation, then the stream of payments to be received pursuant to a Chapter 11 plan must be discounted to present value, and that is the case even if the amount of the distribution in a Chapter 7 liquidation would be less than 100%. *See Nohr,* 1988 WL 88767, at *2 (holding, in a Chapter 11 case of debtors whose unsecured creditors would have received less than 100% in a Chapter 7 liquidation, that the debtors' Chapter 11 plan failed to comply with the best-interests-of-creditors test given that the present value of the stream of payments provided for in the plan was less than the amount the creditors would have received in a Chapter 7 liquidation). *Cf.* 5 Keith M. Lundin, *Chapter 13 Bankruptcy* § 465.1 (3d ed. 2000 & Supp. 2007–1) ("Even when hypothetical liquidation of

the estate would pay less than 100 percent of unsecured claims, the amount to be distributed to unsecured creditors over the life of the Chapter 13 plan must be discounted to present value to ensure that the § 1325(a)(4) test is respected as of the effective date of the plan. This discounting requires selection of an appropriate interest rate."). *See also* 2 Lundin, *supra,* § 162.2 ("[I]f liquidation would produce a 50 percent dividend to unsecured claim holders in a Chapter 7 case, then the value of property to be distributed to unsecured claim holders through the Chapter 13 plan must equal or exceed 50 percent on the effective date of the plan.... To compensate creditors for the time value of money, the best-interests-of-creditors test can be satisfied by paying unsecured claim holders interest on the portion of their claims that will be paid during the plan. In the example, the present value of the ... stream of payments could be preserved at 50 percent by paying 50 percent of allowed claims plus interest." (footnotes omitted)).

■ Although the need to use a discount rate in order to satisfy the best-interests test is well established, there is less certainty over the method that should be used to determine the appropriate rate in any given case. In deciding whether to confirm the Amended Plan, however, the Court need not endorse any particular discount rate—or the methodology that should be used for arriving at a rate—in this case or any other. The Debtor estimates in his liquidation analysis that Cadles would receive $9,519 in a Chapter 7 liquidation.[9] The Plan provides for eight annual payments of $1,250 (for a total payment of $10,000), a stream of payments that would have a net present value roughly equivalent to the liquidation amount of

---

9. The Debtor referred to an appraisal of his residence dated December 2008 in his liquidation analysis, but has neither provided that appraisal nor a more recent one to the Court.

For purpose of this opinion, however, the Court will assume that the values of the assets set forth in the Debtor's liquidation analysis are accurate.

$9,519 only if a discount rate of approximately 1% were used. For the reasons explained below, the Court readily concludes that Hockenberry, by effectively using such a low discount rate, has not carried his burden of proving that the Amended Plan provides Cadles with a value, as of the effective date of the Amended Plan, that is at least equal to the amount it would receive in a Chapter 7 liquidation.

No controlling authority exists addressing the precise question of the appropriate methodology for determining the interest rate to be applied in the context of discounting a stream of payments to present value pursuant to § 1129(a)(7)(A)(ii). Given the absence of any such authority, the Supreme Court's decision in *Till* is an appropriate starting point for the analysis. The interest rate question in that case arose in the Chapter 13 cramdown context; the section of the Bankruptcy Code at issue was § 1325(a)(5), under which a court may confirm a Chapter 13 plan, if at all, only if each holder of an allowed secured claim (1) accepts the plan, (2) receives the property securing its claim or (3) retains its lien and receives "value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [that] is not less than the allowed amount of such claim[.]" 11 U.S.C. § 1325(a)(5)(B). Like § 1129(a)(7)(A)(ii), the alternative set forth in § 1325(a)(5)(B) refers to value *as of the effective date of the plan* and thus requires the use of a discount rate to determine the net present value of a stream of payments. In construing this alternative, the Supreme Court in *Till* adopted a "formula approach" that "begins by looking to the national prime rate [reflecting] the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default" and then "adjust[s]

the prime rate" based on the risk of nonpayment. *Id.* at 478–79, 124 S.Ct. 1951. "Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach ... requires a bankruptcy court to adjust the prime rate accordingly." *Id.* at 479, 124 S.Ct. 1951.

While not endorsing any particular risk adjustment, the Supreme Court noted that "other courts have generally approved adjustments of 1% to 3%," *id.* at 480, 124 S.Ct. 1951, but also stated that "[t]he appropriate size of th[e] risk adjustment depends ... on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan" and that "the debtor and any creditors may present evidence about the appropriate risk adjustment." *Id.* at 479, 124 S.Ct. 1951. The Supreme Court also suggested that, if the debtor proposes a rate that would compensate the creditor for inflation risk and a relatively slight risk of default (*i.e.,* something approximating the prevailing prime rate), then the evidentiary burden of an upward risk-based adjustment should be on the creditor. *See id.* at 479, 124 S.Ct. 1951 ("[S]tarting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing...."). *See also Gen. Elec. Credit Equities, Inc. v. Brice Road Devs., L.L.C. (In re Brice Road Devs., L.L.C.),* 392 B.R. 274, 280 (6th Cir. BAP 2008) (in a Chapter 11 case where the debtor proposed a cramdown interest rate of 6% per annum as being "within the range of the rates in an efficient market," the court relied on *Till* to hold that "[i]t is [the creditor's] burden to demonstrate that a higher rate than that proposed by the Debtor is appropriate."). Here, however, the burden of demonstrating the appropriateness of a higher risk-adjusted rate did

not shift to Cadles given that the Amended Plan effectively provides for a discount rate—1% per annum—that would not come close to compensating Cadles for the risk of inflation and even a relatively slight risk of default.[10]

True, *Till* was decided in the context of a cramdown of a secured claim in a Chapter 13 case, and Cadles has an unsecured claim in a Chapter 11 case. The fact that this is a Chapter 11 case, however, is a distinction without a difference in the context of the Amended Plan given that there is no evidence of an efficient market for financing the Debtor's obligations. *See Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005) ("[T]he market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should [in the context of a Chapter 11 cramdown] employ the formula approach endorsed by the *Till* plurality."). Nor should the fact that the claim held by Cadles is unsecured rather than secured result in the use of a lower discount rate. *Cf. In re Evans*, No. 10–80446C–13D, 2010 WL 2976165, at *4 (Bankr.M.D.N.C. July 28, 2010) ("Although the present case involves unsecured claims under section 1325(a)(4) rather than secured claims under section 1325(a)(5)(B)(ii) as was the case in *Till*, this court believes that the formula approach described in *Till* is the appropriate approach to determining the rate of interest required in this case to provide the unsecured creditors with the present value of their claims."); *In re Hoskins*, 405 B.R. 576, 588 (Bankr. N.D.W.Va.2009) (same). *See also In re Plascencia*, 354 B.R. 774, 783 (Bankr. E.D.Va.2006) (denying confirmation after determining that funds available to pay unsecured claims in a Chapter 7 liquidation exceeded the present value of the payments the unsecured creditors would receive under the proposed Chapter 13 plan).[11]

---

**10.** The current prevailing prime rate is 3.25% per annum, which also was the prime rate at the time of the Hearing. The Court takes no position on whether the prime rate must be used in the Debtor's case and also does not reach the risk adjustment, if any, that would be appropriate here. Just by way of example, however, using the prime rate of 3.25% per annum without any risk adjustment, the present value of the payments Hockenberry intends to make to Cadles under the Amended Plan would be approximately $8,783—an amount even lower than the $9,519 that the Debtor's own liquidation analysis estimates Cadles would receive in a Chapter 7 liquidation.

**11.** Although it is not reaching the issue, the Court notes that the interest rate that would need to be paid on unsecured claims, at least against an insolvent debtor, could be higher in some cases than the interest rate to be paid on secured claims against the same debtor. *See In re Griswold Bldg., LLC*, 420 B.R. 666, 696 (Bankr.E.D.Mich.2009) ("As the Court has also noted, there is a strong argument to be made that the risk of nonpayment of the unsecured portion of the Lender's Class I claim is even greater than the risk of nonpayment of the secured portion of the Lender's Class I claim. That additional risk would seem to support an even higher interest rate adjustment to the unsecured portion of the Lender's Class I claim."); *In re Mirant Corp.*, 334 B.R. 800, 820–21, 823 (Bankr.N.D.Tex. 2005) ("[A shareholder of Mirant on behalf of himself and other shareholders] argues that a plan could be proposed that would leave all Mirant Group creditors with debt bearing interest at rates of prime to prime-plus-three, Mirant Group's cash flow being, [the shareholder] claims, more than sufficient to service all of the debt.... [The shareholder], though, fails to give due weight to the difference between a[ ] [secured] obligation ... and unsecured debt or stock.... Even assuming *Till's* range of rates of prime plus 1%–3% is the applicable cram down rate for every secured claim, *Till* does not specify interest rates a debtor should pay on unsecured debt.

Indeed, the Supreme Court in *Till* stated that "[w]e think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these [other] provisions," *Till*, 541 U.S. at 474, 124 S.Ct. 1951. The other provisions referenced by the Supreme Court included Chapter 11's version of the best-interests-of-creditors test, § 1129(a)(7)(A)(ii), *see id.* at 474 n. 10, 124 S.Ct. 1951, which applies equally to secured and unsecured claims. An approach based on *Till* would be consistent with case law decided in the Chapter 11 best-interest context prior to *Till*. For example, at a time when the prime rate was approximately 9% per annum, the bankruptcy court in *Nohr* used (albeit with no discussion) a discount rate of 12% per annum to conclude that a Chapter 11 plan failed to comply with § 1129(a)(7)(A)(ii) with respect to unsecured creditors. *See Nohr,* 1988 WL 88767, at *2. Since *Till,* at least one court has followed its approach when discounting a stream of payments pursuant to another provision of Chapter 11 that, like § 1129(a)(7)(A)(ii), requires creditors to receive a certain value as of the effective date of the plan. *See In re G–I Holdings Inc.,* 420 B.R. 216, 266–67 (D.N.J.2009) ("Section 1129(a)(9)(C) requires that payment of priority tax claims shall be made in the full amount as of the Effective Date of the Plan. . . . The Court is satisfied that the testimony demonstrated that no efficient market for credit exists under these circumstances. Thus, the

Court concludes that the 'formula approach' that was adopted by the Court in *Till* should be used to determine the proper rate of interest for the treatment of the IRS's Priority Tax Claim.").

The Court recognizes that certain other courts have used the federal judgment rate to determine compliance with the best-interest-of-creditors test with respect to unsecured claims in Chapter 13 cases of solvent debtors. *See, e.g., In re Smith,* 431 B.R. 607, 611 (Bankr.E.D.N.C.2010) (rejecting the application of the *Till* rate and holding that "in a chapter 13 case, where there are sufficient non-exempt assets, which if liquidated in a chapter 7, would require payment at the legal rate of interest under § 726(a)(5) and 28 U.S.C. § 1961, the federal judgment rate or legal rate will be paid on the declining principal balance of the unsecured claims from the petition date until the unsecured declining principal balance is paid in full."); *In re Suggs,* No. 10–04400–8–JRL, 2011 WL 710488, at *2 (Bankr.E.D.N.C. Feb. 22, 2011) (following the *Smith* approach). Under § 726(a)(5) of the Bankruptcy Code, "property of the estate shall be distributed . . . in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection" before any distribution is made to the debtor. Section 726(a)(5)'s requirement that interest be paid at the legal rate in a Chapter 7 liquidation if the debtor's estate is solvent applies indirectly in reorganization cases of solvent debtors by virtue of the best-interests-of-creditors test.[12] The court in

[C]laims . . . subject to greater risk, would have to be satisfied with obligations bearing higher interest." (footnote omitted)).

12. The interest that a creditor is entitled to receive "[p]ursuant to section 726(a)(5) of the Bankruptcy Code . . . in a chapter 7 liquidation of a solvent debtor . . . at the legal rate from the date of the filing of the petition" is known as "pendency interest." *In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 256

(Bankr.S.D.N.Y.2007) (internal quotation marks omitted). "Because section 1129(a)(7) of the Bankruptcy Code requires that a chapter 11 plan of reorganization provide non-consenting impaired creditors, as of the effective date of . . . such plan, with at least as much as they would receive in a hypothetical chapter 7 liquidation on such date, the requirements of section 726(a) are imported into a chapter 11 case." *Id. See Thompson v. Ky. Lumber Co. (In re Ky. Lumber Co.),* 860

*Smith* extended the application of § 726(a)(5) beyond the date of confirmation to the date of completion of payments under the plan, holding that, where the estate is solvent and there are sufficient funds remaining to pay interest on unsecured claims, the federal judgment rate should be used not only to calculate pendency interest from the petition date through confirmation, but also from the confirmation date through the date of completion of payments under the plan for purposes of determining compliance with the best-interests test. *See Smith,* 431 B.R. at 611.

The federal judgment rate under 28 U.S.C. § 1961 as of the date of the Hearing was much less than 1% per annum (and still is).[13] The *Smith* approach, therefore, would support the Debtor's use of what is effectively a 1% discount rate. As far as the Court is aware, however, the cases that have used the federal judgment rate or some other rate lower than the prime rate to discount a stream of payments to present value in order to satisfy the best-interests test were decided in the context of solvent debtors. *See, e.g., Suggs,* 2011 WL 710488, at *2 (stating that

the federal judgment rate "mirrors the reality ... that unsecured creditors with the benefit of a solvent debtor are faced with minimal risk"); *Smith,* 431 B.R. at 611. *See also In re Cook,* 322 B.R. 336, 345 (Bankr.N.D.Ohio 2005) ("Due to the amount of equity in Debtor's estate ... prime minus one-half of one percent, is more than sufficient to satisfy the requirements of 11 U.S.C. § 1325(a)(4) [with respect to unsecured creditors].").

▪ The federal judgment rate currently is so low that it would not even compensate the creditor for the current rate of inflation, which is more than 3%. *Cf. Till,* 541 U.S. at 479, 124 S.Ct. 1951 (noting that the formula approach compensates for, among other things, "the risk of inflation"); *Hardy,* 755 F.2d at 77 ("Given our inflationary economy, we cannot assume that the final $300 deferred payment under the debtor's plan will have the same value as a $300 payment from the debtor's liquidated estate. Simply stated, in an inflationary economy one dollar today is of greater value than one dollar tomorrow."). And, as noted above, the Supreme Court in *Till* stated that Congress likely intended the same approach it used in that case to be

F.2d 674, 678 (6th Cir.1988) ("Section 726 does not apply directly to Chapter 11 cases. It does, however, apply indirectly through the 'best interests of creditors' test found in section 1129(a)(7).").

13. *See* www.uscourts.gov/FormsAndFees/ Fees/PostJudgementInterestRates.aspx (last visited Sept. 14, 2011) ("Interest is allowed on most judgments entered in the federal courts from the date of judgment until paid.... Under [28 U.S.C. § 1961] the rate of interest used in calculating the amount of post judgment interest is the weekly average 1–year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System.... The current rate applicable under these sections is provided by the Federal Reserve and published each Monday for the preceding week (unless that day is a holiday in which case the rate is published on the

next business day). The specific rate referred to in the statutes is found in the table under the two columns headed WEEK ENDING. The two dates under those columns refer to the Friday averages of the last two weeks. Under those columns you need to go down to the row which states U.S. government securities—Treasury constant maturities nominal— 1–year. Where the row and columns meet— that is the rate you use."). Even if a Treasury rate were the appropriate rate to apply in the context of post-confirmation interest—an issue the Court does not reach—then it would make sense to use a rate for a Treasury with a maturity that matched as closely as possible the length of the repayment period under the plan. Here, the length of the repayment period to Cadles is eight years. The interest rates for 7–year and 10–year Treasury constant maturities nominal were in excess of 1% at the time of the Hearing (and still are).

used under the various provisions that require discounting a stream of payments to present value. But, assuming for the sake of this opinion only that it would be appropriate to use the federal judgment rate in the context of solvent debtors, the Court finds that using the federal judgment rate from the date of confirmation to the date payments are completed under the plan in the context of an estate of an *insolvent* debtor would not be appropriate. Rather, the discount rate selected must compensate creditors for the risks inherent in waiting to receive payments over time from an insolvent debtor. All in all, the Court concludes that using the federal judgment rate to discount a stream of payments to present value would not be appropriate in the context of the best-interest-of-creditors test with respect to unsecured claims in Chapter 11 cases of insolvent debtors. For all of the reasons explained above, the Court, while not deciding what interest rate would satisfy the requirement of § 1129(a)(7)(A)(ii) in this case or any other, concludes that Hockenberry has not carried his burden of establishing that the Amended Plan provides Cadles with a value, as of the effective date, that is at least equal to the amount Cadles would receive in a Chapter 7 liquidation. The Amended Plan, therefore, does not satisfy § 1129(a)(7).

## C. Feasibility

▮▮▮ The Amended Plan also fails to satisfy § 1129(a)(11). Under that section, the Court may confirm an otherwise confirmable plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "Although the [Bankruptcy] Code does not use the terms 'feasible' or 'feasibility,'" *In re Red Mountain*

*Mach. Co.,* 451 B.R. 897, 906 n. 22 (Bankr. D.Ariz.2011), the requirement imposed by § 1129(a)(11) is commonly known as the "'feasibility' test for confirmation." *Future Energy,* 83 B.R. at 502. "Bankruptcy courts have an affirmative obligation to ensure that plans are feasible." *In re Multiut Corp.,* 449 B.R. 323, 347 (Bankr. N.D.Ill.2011). The purpose of the feasibility test is to determine whether there is a reasonable probability that creditors will receive the payments provided for in the plan. *See G–1 Holdings,* 420 B.R. at 267 ("[T]he key element of feasibility is whether there is a reasonable probability [that] the provisions of the Plan can be performed."); *Brice Road Devs.,* 392 B.R. at 283 ("Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." (internal quotation marks omitted)).

Based on the evidence presented during the Hearing, the Court cannot find that there is a reasonable probability that the Debtor will be able to fund the Amended Plan in the amount he must pay in order to satisfy § 1129(a)(7)—or, for that matter, in the amount he had proposed to pay. At a minimum, to satisfy the feasibility requirement, even if the amount the Debtor proposed to pay Cadles in the Amended Plan had been sufficient to satisfy § 1129(a)(7), he would have needed to demonstrate two things. First, because Hockenberry testified that without his spouse's income he would not be able to make his plan payments, the Debtor needed to show that Mrs. Hockenberry had committed to providing the cash necessary to fund the Amended Plan. *See Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.),* 632 F.3d 168, 173 (5th Cir.2011) (holding that there was "ample evidence supporting the conclusion that [the debtor's Chapter 11] plan was not feasible" where the debtor had obtained no

firm commitments to fund certain of its obligations under the plan); *In re Repurchase Corp.*, 332 B.R. 336, 343 (Bankr. N.D.Ill.2005) ("[F]indings of facts that highlighted the glaring deficiencies in the proposed Plan were dictated from the bench. This included a finding that Debtor had failed to prove that funding was available to finance the $100,000 to be paid to creditors or the $500,000 as capital required to restart that business, as required by the Plan. The only evidence offered on that point came in the form of Mr. Greenblatt's testimony that his wife would be the contributing source for needed capital and that Debtor would also enter into 'sharing agreements' for unitization of its NOLs for the purpose of generating cash for postconfirmation operations. But in the absence of any form of corroboration or contract from the alleged sources of these funds, Mr. Greenblatt's testimony amounted to nothing more than sheer speculation and wishful thinking. . . . Allowing Debtor's confirmation to be based on a hope against hope that the financing [would] actually materialize post-confirmation without some form of corroboration would go against a bankruptcy judge's duties of ensuring that the Plan complies with the provisions of the Bankruptcy Code. As the Plan's proponent, Debtor had the obligation of proving that the Plan, as proposed, was feasible. Optimistic but hollow declarations from Debtor's President about hopes for funding did not satisfy its burden of proof." (citations and internal quotation marks omitted)), *aff'd*, No. 05C7075, 2008 WL 4379035 (N.D.Ill. Mar. 24, 2008). In addition, to establish feasibility, Hockenberry needed to provide evidence that his spouse not only had committed to contribute the necessary funds, but also that she would have had the ability to do so during the life of the Amended Plan. *See In re Wiston XXIV, Ltd. P'ship*, 153 B.R. 322, 327 (Bankr.D.Kan.1993) ("As filed, the debtor's plan does not demonstrate that its income will be sufficient to pay its expenses plus the payments due under the plan. The general partner's promise to pay $100,000 cash to the debtor in the next two years is not supported by proof he has any tangible means of satisfying that promise. Without his contribution, the plan shows a negative cash flow, even assuming everything else goes as the debtor has projected. . . .").

Having determined that the Amended Plan does not satisfy the best-interests-of-creditors and feasibility tests, the Court need not address the other confirmation requirements or the parties' arguments regarding the extent to which the absolute priority rule continues to apply in individual Chapter 11 cases after the enactment of the BAPCPA.[14] *Cf. In re Chadda*, No. 07–

14. A split of authority exists regarding the extent to which the absolute priority rule continues to apply in the Chapter 11 cases of individuals after the enactment of BAPCPA. *See generally* David S. Jennis & Kathleen L. DiSanto, *Application of Absolute–Priority Rule and New–Value Exception in Individual Chapter 11s*, 30–Aug. Am. Bankr. Inst. J. 56 (July/Aug. 2011). Post–BAPCPA, § 1129(b)(2)(B)(ii) provides that "in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115," and § 1115(a) in turn states that, in an individual case, property of the debtor's bankruptcy estate includes certain property "in addition to the property specified in section 541"—namely, "all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first" and "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first." 11 U.S.C. § 1115(a). A few courts—including those deciding the issue relatively soon after the enactment of BAPCPA—held that the 2005 amendments completely abrogated the absolute priority rule in the Chapter 11 cases of

12665, 2007 WL 3407375, at *3 (Bankr. E.D.Pa. Nov. 9, 2007) ("Unless a proposed chapter 11 plan is feasible, a court need not consider the other objections to confirmation."); *In re Made in Detroit, Inc.,* 299 B.R. 170, 181 (Bankr.E.D.Mich.2003) ("The Committee also argues that the Debtor's Plan cannot be confirmed because it violates the absolute priority rule. Because the Court holds that the Debtor's Plan is not feasible under 11 U.S.C. § 1129(a)(11) ... the Court does not need to address 11 U.S.C. § 1129(b).").

## V. Conclusion

For the reasons set forth above, confirmation of the Amended Plan is **DENIED** without prejudice to the Debtor's refiling a second amended Chapter 11 plan. If the Debtor intends to file and seek confirmation of a second amended Chapter 11 plan, then the Debtor will need to provide: (1) testimony from Mrs. Hockenberry regarding her commitment and ability to provide the cash necessary to fund any such plan; (2) if there is an objection to the plan by Cadles, a revised Form B22 or other evidence that would allow the Court to calculate "the projected disposable income of the [D]ebtor (as defined in section 1325(b)(2)) to be received during the 5–year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer[,]" 11 U.S.C. § 1129(a)(15); (3) an appraisal of the Debtor's real estate and other nonexempt assets for purposes of calculating the amount he must pay to satisfy the best-interests-of-creditors test; and (4) if there is once again an impaired class of unsecured claims that has not accepted the plan, for purposes of analyzing compliance with the absolute priority rule (to the extent it is applicable), the value of the Debtor's retained interest in his nonexempt prepetition property and the evidence of new value being contributed from the Debtor's exempt assets or from Mrs. Hockenberry.

**IT IS SO ORDERED.**

individuals. *See In re Shat,* 424 B.R. 854, 862–68 (Bankr.D.Nev.2010); *In re Roedemeier,* 374 B.R. 264, 273–76 (Bankr.D.Kan.2007); *In re Tegeder,* 369 B.R. 477, 479–80 (Bankr. D.Neb.2007). But "[m]ore recently, an emerging majority of courts have concluded that the absolute-priority rule remains alive (and kicking) in individual chapter 11 cases[.]" Jennis & DiSanto, 30–Aug Am. Bankr. Inst. J. at 56. Decisions in this emerging majority include *In re Lindsey,* No. 10–31694, 453 B.R. 886, 892–900 (Bankr. E.D.Tenn.2011); *In re Maharaj,* 449 B.R. 484, 491–94 (Bankr.E.D.Va.2011); *In re Kamell,* 451 B.R. 505, 507–12 (Bankr.C.D.Cal.2011); *In re Draiman,* 450 B.R. 777, 820–22 (Bankr. N.D.Ill.2011); *In re Walsh,* 447 B.R. 45, 47–49 (Bankr.D.Mass.2011); *In re Stephens,* 445 B.R. 816, 820–21 (Bankr.S.D.Tex.2011); *In re Karlovich,* 456 B.R. 677, 679–82 (Bankr. S.D.Cal.2010); *In re Gelin,* 437 B.R. 435, 440–43 (Bankr.M.D.Fla.2010); *In re Steedley,* No. 09–50654, 2010 WL 3528599, at *2–3 (Bankr.S.D.Ga. Aug. 27, 2010); *In re Mullins,* 435 B.R. 352, 359–61 (Bankr.W.D.Va.2010); and *In re Gbadebo,* 431 B.R. 222, 227–30 (Bankr.N.D.Cal.2010).